Pages 1 - 41

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. CR 12-0089 |
| | ) | |
| GIUSEPPE PENZATO and KESIA | ) | |
| PENZATO, | ) | |
| | ) | San Francisco, California |
| Defendants. | ) | Wednesday |
| _____ | ) | May 22, 2013 |

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

| | |
|---|---|
| **For Plaintiff**: | Melinda L. Haag |
| | United States Attorney |
| | 450 Golden Gate Avenue, 9th Floor |
| | San Francisco, California  94102 |
| | **By:  Owen Peter Martikan, AUSA** |
| | |
| **For Defendant** | Clarence Dyer & Cohen LLP |
| **Giuseppe Penzato:** | 899 Ellis Street |
| | San Francisco, California 94109 |
| | **By:  Josh Alan Cohen, Esquire** |
| | |
| **For Defendant:** | **Gail R. Shifman, Esquire** |
| **Kesia Penzato:** | 601 California Street, Suite 1800 |
| | San Francisco, California 94108 |
| | |
| **Also Present:** | **Stella Hecht, Portuguese Interpreter** |

(Appearances continued on next page)

**Reported By:**   *Katherine Powell Sullivan, CSR #5812, RPR, CRR*
                        *Official Reporter - U.S. District Court*

**APPEARANCES (CONTINUED)**:

Also Present:            Latham & Watkins, LLP
                         140 Scott Drive
                         Menlo Park, California 94025-1008
                    By:  **Lisa K. Nguyen, Esquire**

                         Legal Outreach
                         1121 Mission Street
                         San Francisco, California 94103
                    By:  **Cindy C. Liou, Esquire**

1                          **P R O C E E D I N G S**

2    **MAY 22, 2013**                                    **11:07 A.M.**

3              **THE CLERK:**  Calling Case CR 12-0089, USA versus Kesia

4    Penzato and Giuseppe Penzato.

5         Counsel and Interpreter, please come to the podium and

6    state your name for the record.

7              **MR. MARTIKAN:**  Good morning, Your Honor.  Owen

8    Martikan for the United States.

9              **THE COURT:**  All right.  Thank you, Mr. Martikan.

10             **MR. COHEN:**  Good morning, Your Honor.  Josh Cohen for

11   Giuseppe Penzato, who's present.

12             **DEFENDANT MR. PENZATO:**  Good morning, Your Honor.

13             **THE COURT:**  All right.  Thank you.  Good morning.

14             **MS. SHIFMAN:**  Good morning, Your Honor.  Gail Shifman,

15   who's present with Kesia Penzato, being assisted by the

16   Portuguese language interpreter who's previously been sworn in

17   this matter.

18             **THE COURT:**  All right.  Thank you, Ms. Shifman.

19             **MS. SHIFMAN:**  Your Honor, may our clients be seated as

20   we proceed?

21             **THE COURT:**  Yes, they may.

22             **MS. SHIFMAN:**  Thank you.

23             **THE COURT:**  And I understand that counsel for the

24   victim is present as well, in attendance.  Is that right?

25             **MS. NGUYEN:**  Yes, Your Honor.  My name is Lisa Nguyen

1  of Latham & Watkins.

2          THE COURT:  All right.  Thank you, Ms. Nguyen.  And

3  your client is?

4          MS. NGUYEN:  My client is here in the courtroom.

5  She's also represented by Cindy Liou of Legal Outreach.

6          MS. LIOU:  My name is Cindy Liou, from Asian Pacific

7  Islander Legal Outreach, co-counsel in this case, Your Honor.

8          THE COURT:  All right.  Thank you.

9      This is the date that has previously been set for

10  sentencing in this matter.  And there has not been a pretrial

11  report prepared, right, in this case?

12          MR. MARTIKAN:  Correct.

13          MR. COHEN:  Correct, Your Honor.

14          THE COURT:  But just briefly recalling the history, I

15  think there was originally a criminal complaint that was filed

16  and then an indictment that was returned in February of 2012,

17  in this matter, and it did charge conspiracy to obtain forced

18  labor and also forced labor and attempt, a two-count

19  indictment.

20      And then, as I understand it, a superseding indictment

21  then was filed --

22          MR. MARTIKAN:  Information, Your Honor.

23          THE COURT:  Pardon?

24          MR. COHEN:  Information.

25          THE COURT:  Information was filed in this matter,

1  which essentially asserts -- charges a misdemeanor.  And the

2  misdemeanor is -- what is the statutory section?

3         MR. MARTIKAN:  It's 18 United States Code Section

4  1028(a)(6), and (f) being the conspiracy provision.

5         THE COURT:  Right.  That's conspiracy to possess an

6  identification document produced without lawful authority?

7         MR. MARTIKAN:  Correct.

8         THE COURT:  All right.  And then that -- a plea

9  agreement, then, was entered on that count.  And the date of

10 that plea agreement is -- was just in April.

11        MR. MARTIKAN:  18th, Your Honor.

12        MR. COHEN:  Correct, Your Honor.

13        THE COURT:  This is dated the 17th, but I guess it was

14 the 18th by the time we probably took the plea in this matter.

15     And sentencing were set today without the benefit and

16 necessity of a pretrial report; presumably, in part because

17 this is a misdemeanor.

18     I guess this is a Class A misdemeanor?

19        MR. COHEN:  Correct, Your Honor.

20        MR. MARTIKAN:  Yes.

21        THE COURT:  And so we're here for sentencing, but I

22 think we have an unusual procedural situation here given the

23 fact that, on behalf of the victim, Ms. Nguyen has filed a

24 number of documents, including a letter brief as well as some

25 materials.  And those materials had not been released to the

1  parties until today, when I made an inquiry of counsel,

2  victim's counsel, about whether there was a problem in sharing

3  that.

4      So I understand now, although it is late in terms of

5  proximity to this hearing, you have received those papers,

6  Counsel?

7          MR. MARTIKAN:  Yes, Your Honor.

8          MR. COHEN:  About an hour ago, Your Honor, yes.

9          THE COURT:  Have you had a chance to review those?

10          MR. COHEN:  We have had a chance to read them, Your

11  Honor, yes.

12      I have to say, Your Honor, I know that's not probably what

13  the Court is asking us to say at this point, but while I

14  recognize that Ms. Liou and Ms. Nguyen are pro bono counsel and

15  they don't practice criminal law and aren't regular

16  participants in the criminal process in this courtroom, I don't

17  know how any lawyer could believe for a second that it's

18  appropriate to file those kind of incendiary, accusatory

19  allegations in camera, ex parte, without even giving us notice

20  that they were being filed so that we could make appropriate

21  inquiry in an effort to get copies of them.

22      These are very serious charges that the purported victim

23  is making in these documents, and the notion that we would not

24  be advised of those charges is offensive.

25          THE COURT:  All right.

1          **MR. MARTIKAN:**  Let me just explain a little bit of the

2    context here.  And it's really -- it comes from a Ninth Circuit

3    opinion that came out about a month ago, called the

4    United States versus Rausini, R-a-u-s-i-n-i.  It's unpublished,

5    but the Westlaw cite is 2013 Westlaw 1777723.  That's four

6    sevens and two-three.

7          That was an opinion that was actually directed towards our

8    office, in which the Ninth Circuit panel found that one of our

9    AUSAs had breached a plea agreement when they transmitted to

10   the Court a letter from a relative of a defendant who was going

11   to be sentenced, the letter recommending that the judge not

12   adopt what the parties had agreed to for sentencing.

13         Now, in that case the letter was not from a victim, which,

14   in the government's view, distinguishes it from this case.

15   However, the Court did say that the letter -- the District

16   Court could view the letter as a proxy from the United States

17   Attorney's Office recommending against reducing the defendant's

18   sentence.

19         So given that very recent authority directed towards this

20   office, when I became aware that the victim's attorneys wanted

21   to submit something on the victim's behalf to the Court, that I

22   anticipated would be contrary to the parties' plea agreement, I

23   didn't feel it was appropriate for me to do the usual thing,

24   which would be for me to either submit them to Your Honor

25   from -- from the United States Attorney's office or, otherwise,

1  I would have given it to Probation, which obviously wasn't

2  possible in this case.

3      So I told counsel that, based on this authority, I didn't

4  feel we could be involved in that process at all and they would

5  have to submit this material directly to Your Honor.  So that's

6  how this has come about.  And it's a bit unique, but it's

7  really driven by the Ninth Circuit's analysis of breach of --

8      **THE COURT:**  Okay.  But that doesn't answer the

9  question:  Why ex parte?  Because that's what's unusual about

10 this.

11     **MR. MARTIKAN:**  Well, usually what would happen is the

12 material would come to the U.S. Attorney's Office through our

13 victim witness coordinator, and we would distribute it either

14 to Probation and defense or else to Your Honor and to the

15 defense.  But in this case we didn't want to distribute

16 something that could be seen, potentially, as a proxy for some

17 recommendation against our plea.

18     **THE COURT:**  Yeah.  Now, that I understand.  I guess --

19 and maybe I should hear from Ms. Nguyen.

20     Why don't you come on up, Ms. Nguyen.

21     The problem is once you, basically, said you're going to

22 stay out of this because of this Ninth Circuit case, and

23 suggested that they deal with it without going through your

24 office -- which I guess I can understand -- the problem is,

25 having received this, though, on an ex parte basis is

1   problematic because it involves the due process rights of the

2   defendants when we don't -- we don't sentence people here based

3   on secret information unless you go through a lot of stuff.

4   And it raises serious due process questions, so that's the

5   problem.

6        Maybe you're not versed in federal criminal procedure and

7   didn't know, but that is a problem.  And that's why I had Betty

8   call.  When I realized this had been submitted ex parte without

9   sharing, that's why I had her call this morning to see if you

10  had any problems sharing it.

11        **MS. NGUYEN:**  Your Honor, so Ms. Liou and I have both

12  actually submitted victim impact statements in cases before,

13  and I think that this is an unusual circumstance where there's

14  no probation officer who is assigned to the case.

15        So, typically, we've received the letter from the victim

16  advocate unit saying, submit the victim impact statement to the

17  U.S. Attorney's Office.

18        In this circumstance, we did as we usually do, submit it

19  to the U.S. Attorney's Office through the victim advocate unit,

20  and -- but then were told that this was not going to be

21  distributed to the parties as is typical in these cases.

22        So once we learned that, we did try to go through the

23  U.S. Attorney's Office through -- and we discussed this with

24  Ms. Lee, your clerk, as to how to go about submitting these

25  papers.  And that's when we were told to go ahead and submit it

1  directly to your chambers with a cover letter stating that it

2  should be in-camera review only.  Although we -- when we

3  originally discussed this, we only wanted the information to be

4  under seal and to ensure that our client's identity was

5  protected.

6      So there was no intent to withhold this from either of the

7  parties.  We knew that Mr. Martikan had received the documents

8  and we, as per course in our other cases, expected that those

9  documents were going to be submitted to the defendants.

10      **MS. LIOU:**  Your Honor, the victim witness letter that

11  we usually receive in these cases that we work on actually

12  directs us to send the information directly to the

13  U.S. Attorney's Office and not to the Court, which is what we

14  did in this case as early as May 2nd.  And it was rejected.

15      And it's usually not our practice in these cases to submit

16  the information directly to defense in this case.  It is

17  usually the U.S. Attorney's Office that does that on our

18  client's behalf.

19      And we have had further discussions with the

20  U.S. Attorney's Office about this because the procedure and the

21  process seems to be very conflicting and up in the air.  But it

22  has always been our intention and understanding that this

23  information would be given and distributed to the defense.  In

24  fact, some of the information, you know, some of it they have

25  seen it before, such as the civil complaint, so.

 1          **THE INTERPRETER:**  The interpreter couldn't hear your

 2    last --

 3          **MS. LIOU:**  Sure.  Some of the information that's

 4    included is not also entirely new, such as the civil complaint,

 5    which was actually filed before this criminal case that was

 6    initiated.

 7          **MS. SHIFMAN:**  Your Honor, if it was the intent of

 8    these lawyers to notify the defense that materials were

 9    submitted to the Court and they weren't comfortable directly

10    providing those materials to us, they certainly could have

11    provided us with a cover letter indicating that they had

12    submitted materials to the Court.

13          It's not the first time in this matter that they haven't

14    served all of defense counsel; in this case, neither of us.

15    Previously, when they requested a continuance of the

16    sentencing, they didn't bother to follow the local rules and

17    serve all counsel in the case, requesting the continuance.

18          These lawyers, one lawyer is from Latham & Watkins, which

19    has quite a distinguished white color section.  There are

20    lawyers there who can advise them as to how to proceed forward.

21          In our opinion, this type of incendiary kind of

22    information they deliberately only sent it to the Court and

23    didn't notify the parties that they intended to proceed forward

24    with written materials today.

25          **THE COURT:**  Well, all right.  I don't need to reach

1    the question of whether there was deliberate misconduct here.

2    I will say that it should have been obvious that information of

3    this nature cannot be just submitted ex parte without some

4    notification to the concerned parties.

5        Granted, this was an unusual procedure, and I think the

6    U.S. Attorney's Office is going to have to visit what they're

7    going to do, because it doesn't make sense that every time

8    there is an impact victim statement or victim participation

9    that that's going to be deemed a breach of an agreement just by

10   submitting it.

11       I haven't read this case.  I don't know what this

12   unpublished case says, but that would be astounding to me that

13   this was going to happen every time there was a victim

14   statement.

15           MR. MARTIKAN:  No, but, obviously, 99 or more percent

16   of the time there's going to be a probation officer, which

17   would eliminate that issue.  It's just -- and for the -- the

18   victim's recommendations are not going to necessarily be in

19   conflict with what the U.S. Attorney's Office has negotiated.

20   But those two things coming together in this case on the heels

21   of that opinion are, I think, unique.

22           MS. LIOU:  Your Honor, I'd like to address that

23   decision, U.S. versus Rausini.  It opens very clearly saying

24   that this is not a situation involving a victim.  Our client in

25   this case is a victim.  The U.S. versus Rausini case involves

1   codefendants, which is a very different matter.

2       But we, as counsel for the victim, can only do so much

3   when we are not formal parties to the case.  And we are doing

4   our very best to abide by procedures as this is not the first

5   type of case where we have interacted with the system, and we

6   are following instructions the best we can.

7       And we were also instructed to file documents ex parte, as

8   well, by the Court and -- because there was a request to change

9   hearings so that our client could have the right to come to

10  this hearing and there was no move made on any other party to

11  change the scheduling to allow that to happen.

12      **THE COURT:**  Well, so the question is, as we sit here

13  today, whether we proceed or not.  And let me tell you my views

14  initially.

15      Having read these materials, there is a major problem that

16  I see with giving any material weight to what the victim has

17  filed here; and that is, given the nature of the charges that

18  are now at issue, the old charges are no longer at issue.  I

19  have no control over that.

20      The government has the power to supersede indictment and

21  effectively eliminate the original charges.  And the charges

22  now have to do with identification documents and the failure

23  to, I guess, identify the nature of the work that was going to

24  be done pursuant to the visa, working for -- with another

25  person that wasn't identified.

1        And I think the law is clear -- and someone can correct me

2   if I'm wrong -- that when you're seeking restitution in -- and

3   a large part of what you're asking for, I'm not understanding

4   this you're asking for an incarceration, but you're asking for

5   restitution in a greater amount than what's in the plea

6   agreement, that that restitution has to be causally and

7   proximately causally related to the charge.

8        Now, if this was the original indictment and there was a

9   plea to that, I could see that, because the things that are

10  alleged in here and the harm that occurred and all the wage

11  violations and the human rights violations that are alleged are

12  causally related to the original charge, but not causally

13  related to the superseding information now.  And so I don't see

14  how I can take that into account in calibrating restitution.

15        **MS. NGUYEN:**  Your Honor, we disagree that the

16  restitution that we've laid out in our letter brief is not

17  directly caused by the crime that they --

18        **THE COURT:**  Proximately caused.

19        **MS. NGUYEN:**  Proximately caused by the crime that they

20  pled to.  They're basically agreeing that the visa charge that

21  the -- it was visa fraud, basically.

22        And so in order to get this A-3 visa, they had to agree to

23  certain terms for the employment contract.  And they're

24  agreeing that they did not perform on this contract.  And,

25  therefore, because they did not perform on this contract, these

1  harms were -- and losses were inflicted upon our client.

2          THE COURT:  Well, I thought that the -- that the

3  violation here had to do with the failure to designate that the

4  victim would work for somebody else other than the sponsoring

5  employer.

6      It's not that they would pay X or -- it's not the terms,

7  it's the fact that the person who benefited from the visa ended

8  up working for somebody else unauthorized by the visa.

9          MS. NGUYEN:  That's part of it.  It's all part of the

10  contract.  In order to get the A-3 visa, my understanding is

11  that you have to agree to certain terms, including the

12  contract, and that you will not be working for another

13  employer.

14          MS. LIOU:  And the restitution that's been laid out in

15  this agreement includes other wage and hour violations that

16  were calculated -- other violations of that contract by the

17  Penzatos on behalf of our client.

18          THE COURT:  Does someone have the superseding

19  information?  For some reason it's not in here.  Can I get a

20  copy of that?

21          MS. NGUYEN:  Your Honor, part of the calculation, for

22  example, for the wage and hour calculation, includes that

23  second employer.  So they were joint employers.

24          THE COURT:  But the nonpayment of wages by the second

25  employer, how is that part of the charge here?  That's what I

1   want to look at.

2           MS. LIOU:  I believe the original restitution

3   calculation that's laid out in this case, in this agreement,

4   includes violation of the contract between the Penzatos and our

5   client as well.

6       And so our numbers merely also -- accurate calculation

7   under wage and hour law of those particular violations, which

8   take -- they failed to take into account basic calculations of

9   meal and break time penalties, interest, liquidated damages,

10  things that would be calculated in a normal wage and hour

11  case --

12          MS. SHIFMAN:  Your Honor --

13          MS. LIOU:  -- which they're agreeing to pay.

14          THE COURT:  Hold on for a second.

15      So this is a charge under, now, 1028(a)(6).  Is that

16  right?

17          MR. COHEN:  Yes, Your Honor.

18          MS. SHIFMAN:  Yes, Your Honor.

19          THE COURT:  So (a)(6) makes it a crime to knowingly

20  possess an identification document or authentication feature

21  that is or appears to be an authentication document or

22  identification feature of the United States or sponsoring

23  entity of an event designated special event of national

24  significance which is stolen or produced without lawful

25  authority, knowing that such documents were stolen or produced

1  without such authority.

2        How does that apply here?

3        **MS. SHIFMAN:**  Your Honor, the fact that -- that the

4  application didn't reflect that there would be more than one

5  employer would be the false information that was utilized to

6  generate that A-3 visa.

7        **MR. COHEN:**  Well, but let's be clear.  The factual

8  basis that's before this Court concerns an identification

9  document that's issued when someone comes into the country, an

10  I-9 form that the immigration authorities hand to someone when

11  she comes into the country.

12        In this case, Ms. C.D.S. entered the country, she was

13  given that document.  It was based on the visa application.

14  And the reason that the actual document, the I-9, was issued

15  without lawful authority was because she knew at the time, and

16  the Penzatos knew at the time, that she would be working for

17  two employers when the visa only allowed her to work for one.

18        **MS. LIOU:**  Your Honor, that's inaccurate.  Part of the

19  basis of this entire case has to do with the fact that she

20  never agreed to work for more than one employer.  And a lot of

21  the false information -- in order to obtain an A-3 visa, one

22  must go through rigorous interview through the Department of

23  State to submit multiple forms of contract that have to be

24  accepted.

25        In fact, the information that has been submitted clearly

```
 1  demonstrates that some of the first versions of the contract
 2  were not accepted and, ultimately, some of the basis of the
 3  false information for the issuance of the A-3 visa is not
 4  only -- it's not related to the second employer.  That's intent
 5  that the employers created by themselves later.
 6      But to misuse the A-3 visa in conjunction with violation
 7  of the contract on almost every single term that we have laid
 8  out, in terms of wage --
 9          THE COURT:  Well, maybe I should hear from the
10  government.
11      What is the gravamen of the complaint?  All I have is a
12  conclusory statement and information, and I'm hearing two
13  completely --
14      (Simultaneous colloquy by several counsel, which was not
15  reportable.)
16          THE COURT:  Hold on.
17          MR. MARTIKAN:  There's a factual basis in each plea
18  agreement that I think is --
19          THE COURT:  And that's what I read from.
20          MR. MARTIKAN:  Right.
21          THE COURT:  The plea agreement.
22          MR. MARTIKAN:  Paragraph 2 of each plea agreement.
23          THE COURT:  Says, for instance, reading from
24  Mr. Penzato's plea agreement, that he conspired and agreed with
25  his wife to possess an I-94 belonging to the victim, to the
```

1  person identified as the victim.

2       The agreement was produced without lawful authority

3  because it was based on an A-3 visa that required C.D.S. to

4  work only for him as a domestic servant while in the

5  United States when, in fact, he knew that this victim would be

6  working for another person in addition.

7            **MR. MARTIKAN:**  Yes.

8            **THE COURT:**  That's it.

9            **MR. MARTIKAN:**  Yes.

10           **THE COURT:**  There's nothing about, I knew that I was

11  defrauding this person; or, I had made a pledge to pay; or, I

12  had a contract with this person and did not keep that contract.

13  There's nothing of that in here.

14           **MR. MARTIKAN:**  It's just as Your Honor read it.

15           **THE COURT:**  So I have to look at the basis for the

16  plea.

17       Now, you know, I assume that, under the victim's rights

18  law, that the victim was consulted during these processes,

19  including the plea?

20           **MR. MARTIKAN:**  Yes.

21           **THE COURT:**  Well, I mean, that would have been the

22  time, it seems to me, to voice an objection to the plea, saying

23  this is not an appropriate plea, this is not -- And we took the

24  plea in April.  There was no objection at the time.

25           **MS. NGUYEN:**  Your Honor, we did not see the plea

1  agreement before it was signed.

2         THE COURT:  Well, I'm not sure what I can do about --

3  what does the law say if, for instance, that is true and that

4  the victim was not informed of the plea process and the terms

5  of the plea agreement; what's the remedy for that?

6         MR. MARTIKAN:  The problem, Your Honor, is that there

7  were lengthy settlement discussions involving everyone in front

8  of Your Honor, that I just don't want to get into.  I don't

9  think it would be appropriate.

10         THE COURT:  Yeah, I don't want to hear the substance

11  of it.

12         MR. MARTIKAN:  And so I can't really answer that

13  question or the allegation, frankly, without discussing in

14  detail what happened.  And so as far as --

15         THE COURT:  But are you representing that the victim

16  was made aware of the plea process?

17         MR. MARTIKAN:  Yes.  We do not share the actual draft

18  of the plea agreement with victims, ever.  Routinely, we do not

19  do that.  But what we do discuss with victims, where it's

20  appropriate, is the substance of what the plea --

21         THE COURT:  Right.  The reduction in charges was

22  discussed?

23         MR. MARTIKAN:  Yes.

24         THE COURT:  And were they -- was the victim aware of

25  the plea date that we had in April?

1          **MR. MARTIKAN:**  Yes.

2          **MS. NGUYEN:**  Your Honor --

3          **THE COURT:**  Yes.

4          **MS. NGUYEN:**  -- with respect to procedures, this is

5   partly what 18 U.S.C. 364, I believe, is for, for the victim to

6   express concerns over whether or not the restitution amount

7   accurately reflects the victim's losses.  So that's why we're

8   here today at the sentencing hearing.

9          **THE COURT:**  All right.  Well, I understand that.  And

10  your client certainly has a right to do that.  My opening

11  point, however, is that, taking into account those concerns, I

12  am restricted by the law to limit restitution to that which is

13  proximately caused -- has a proximate causal relationship to

14  the crime that is at issue here.

15         And it appears to me, from all the comments you've made,

16  that your issue and your client's issue is with the nature of

17  the charges to which these defendants are pleading.  You would

18  have liked it to include a broader base, not just the

19  misrepresentation of the number of employers that the victim

20  was going to be working for under this visa, but, in fact, a

21  charge that there was a breach of the employment contract and

22  perhaps fraud in getting this person to come, et cetera, et

23  cetera, which would, if true, would then, perhaps, build a

24  causal relationship with the restitution that your victim is

25  seeking, perhaps.

1      But that's not what is before this Court.  And what I'm

2  suggesting is that, had there been an objection at the time the

3  plea was taken, to say this is not an appropriate plea, and

4  asked me to reject the plea on the basis of the conduct, you

5  know, maybe -- at least that's something that would have been

6  understood in terms of the factual allegations that form the

7  basis of the plea here in paragraph 2.

8           MS. NGUYEN:  Your Honor, we do respectfully disagree

9  with that.  We do believe that, even with the charges currently

10  as -- as currently stated, that these are proximate harms that

11  she suffered.

12      For the A-3 visa, the reason why it's there is not only --

13  it's also to protect these sort of situations from occurring,

14  because there's certain rules set in place so that people

15  coming in on these A-3 visas are not exploited or taken

16  advantage of.

17           THE COURT:  But that's not what's charged.

18      I understand that.  I understand that's why.  I understood

19  the allegations that your client's making.

20      The problem is we have a plea agreement, and the plea

21  agreement states a very specific basis -- factual basis for the

22  plea.  And that's the gravamen of the complaint here.  And I

23  think that's what I'm bound to.

24           MS. NGUYEN:  But even as the facts as stated, we

25  believe in the plea agreement because they are agreeing that

1   they knew that there would be a second employer.  And that's to

2   protect our client from having to work for two employers at

3   once.

4         MS. LIOU:  In essence, Your Honor, we have also worked

5   on other cases before, in the past, where certain Chapter 77

6   involuntary servitude types of crimes have been pled down to

7   things such as alien harboring, smuggling, visa fraud.  And

8   those cases usually -- regardless of the factual complaint, I

9   think the understanding of the original charges does form some

10  of the bridge and the factual basis that the ultimate type of

11  criminal conviction that is --

12        THE COURT:  Are you saying you've been in cases where

13  you've been able to intervene and exercise the right of the

14  victim in contravention of a plea agreement that had been

15  reached?

16        MS. LIOU:  Well, Your Honor, generally, in those

17  cases, as in this case, the U.S. Attorney's Office is asking

18  for restitution for our clients in conjunction with the type of

19  work that they have done involuntarily, as part of the initial

20  investigation into this case and the way this case was

21  initiated to begin with.

22     The facts that we brought in our civil complaint, which,

23  again, was filed before this case, has always been very

24  consistent on behalf of our client.  She did not ever knowingly

25  enter and agree on an A-3 visa to enter this country to work

1  for multiple employers.  That is factually not true.

2      And that is something that is filed in our original civil

3  complaint that's very clear.  That's not something that I

4  believe that we were specifically consulted on, but that was

5  going to be stated as such, and that's --

6          **MR. MARTIKAN:**  That's not in the plea agreement.

7          **MS. LIOU:**  Well --

8          **MR. MARTIKAN:**  I mean, I know the defense has said

9  that, but that's not --

10     (Simultaneous colloquy by counsel, which was not

11  reportable.)

12         **THE COURT:**  One at a time.

13     Mr. Martikan.

14         **MR. MARTIKAN:**  This issue about what this victim knew

15  or agreed to is not part of the factual basis for the plea.  I

16  know that defense counsel mentioned that, but it's not part of

17  the factual basis for the plea.

18         **THE COURT:**  All right.  Well, what's the government's

19  view, then, as to -- I'd like your view on the merits of what

20  has been asserted here by the victim, in terms of the expanded

21  restitution --

22         **MR. MARTIKAN:**  I think that what is -- that the

23  restitution amount is appropriate for what is being resolved

24  before Your Honor.  I mean, there are --

25         **THE COURT:**  The restitution amount in the plea

1    agreement?

2         MR. MARTIKAN:   Yes, the plea agreement.   And based on

3    the facts -- the factual basis as set forth in the plea

4    agreement.

5         Now, there are other -- there are other allegations, there

6    are other -- that the parties disagree about.   All three of

7    these parties have various disagreements about many of the

8    facts here.

9         But what is ultimately compromised in this case is what's

10   set forth in the plea agreement.   And the restitution amount

11   that is -- that is negotiated and set forth here is appropriate

12   for these charges.

13        So -- and I think that the Court should accept this plea

14   agreement.   The Court hasn't done that yet, and is within its

15   rights not to, but I think the Court should accept this plea

16   agreement so -- these charges and this restitution amount.

17        And I think it would be inappropriate for either of us,

18   the parties before the Court, to start commenting on other

19   allegations.   I think it would be -- and what potential damages

20   they could give rise to.

21        I mean, we're bound by this plea agreement, so that's why

22   I'm saying I don't think it would be appropriate for us to just

23   start speculating about different damages that aren't before

24   the Court or that aren't subject to this particular --

25        THE COURT:   So you would share the view that the other

1    damages, elements of restitution that are being sought are not

2    proximately related to the -- to the crime as charged and as

3    pled in the plea agreement?

4           MR. MARTIKAN:  Exactly, within this plea agreement.

5           THE COURT:  All right.  So, then, the question is, in

6    exercising my authority under 11(c)(1)(C), am I to consider

7    other potential conduct violative of the statutory section that

8    is more generally alleged in the superseding information in

9    deciding whether or not to accept the plea?

10          MS. NGUYEN:  Your Honor, there --

11          THE COURT:  Hold on.

12          MR. MARTIKAN:  Your Honor can decide in the interest

13   of justice whether or not to accept or reject any plea.  And I

14   don't think the Court is particularly limited in what it thinks

15   about in making that decision.  I think that it's supposed to

16   be based on the interests of justice.

17       I think the interests of justice are served by this plea

18   and this restitution award at this time.  And I think that to

19   bring into it other damages claims -- and I don't want to make

20   any endorsement or disparagement of any of those claims --

21   would basically sort of -- it would bring litigation into this

22   matter that's not before Your Honor.

23          MS. SHIFMAN:  And that is the subject of the civil

24   lawsuit.

25          THE COURT:  I understand that.  I understand that

1  these very claims, in fact, they attach the civil lawsuit.

2          **MS. SHIFMAN:**  That's correct.

3          **THE COURT:**  But I think the larger question is, if

4  there's an allegation made by, let's say, a victim in a case

5  such as this, that there are more serious violations that have

6  been overlooked by the prosecutor or by the parties in reaching

7  the plea agreement, number one, is that something that the

8  Court, in deciding whether to accept a (c)(1)(C) plea is

9  supposed to consider; and, two, how is the Court supposed to

10  resolve that?

11          **MR. COHEN:**  Well, that's exactly the issue, Your

12  Honor.  It would become a hearing within a hearing.  And I

13  think it would raise serious separation of powers concerns.

14      Those same allegations were conveyed to the

15  U.S. Attorney's Office at the inception of this case.  There

16  have been two years' worth of discussions between the parties,

17  and candid exchanges of views and information.  And we have

18  arrived at a resolution that reflects the parties' views of

19  what an appropriate resolution is.  And to reopen that by

20  asking the Court now to, essentially, second-guess the

21  government's determination would, I think, be inappropriate.

22          **THE COURT:**  Is there any law on this?

23          **MR. COHEN:**  I can't point the Court to a case that

24  says that the Court can't second-guess the prosecutor's

25  determination about what an appropriate charge is under a

1  (c)(1)(C) plea agreement.

2      I think, at a general level, we would agree with

3  Mr. Martikan that there are no constraints on what the Court

4  can consider in deciding whether to accept or reject a plea

5  agreement.  But doing this sort of analysis that the plaintiff

6  is now inviting would conflate civil and criminal proceedings

7  and place the Court, I think, in a very difficult position and,

8  at a minimum, require extensive additional hearings to,

9  essentially, try the original indictment.

10      **THE COURT:**  Let me ask you your response, Ms. Nguyen.

11  Are you asking me to reject this plea?

12      **MR. MARTIKAN:**  We're asking you to reconsider the

13  restitution amount that was agreed to.

14      **THE INTERPRETER:**  The interpreter couldn't hear you.

15      **MS. NGUYEN:**  We're asking you to reconsider the

16  restitution amount that was agreed to.

17      **THE COURT:**  But in order to do that, I think I have to

18  reject the plea.  The plea already sets the parameters.  And

19  for me, for instance, to impose prison or for me to impose a

20  restitution amount in excess of the plea agreement amount

21  requires me to reject the plea under Rule 11(c)(1)(C).

22      **MS. NGUYEN:**  Well, we would like to -- Your Honor

23  asked about a case that talks about whether or not it can

24  consider other facts related to the case, that might be outside

25  the scope of what was agreed to in the plea agreement.

```
 1        And there is a case, United States v. Sanga, 967 F.2d

 2    1332, where I believe they agreed to alien harboring and

 3    smuggling, but they ultimately did consider other factual

 4    issues in coming up with the restitution.

 5        MS. LIOU:  Restitution under 3663(a), especially a

 6    client like ours, even in a case like this, where the case has

 7    been pled down to visa fraud or alien smuggling and harboring,

 8    can still be considered a victim of a violent crime; and,

 9    therefore, things such as therapy costs or other forms of

10    restitution is something that should be --

11        THE COURT:  Say that again.  When you have a situation

12    when it has been pled down to visa fraud?

13        MS. LIOU:  And other situations, as long as there can

14    be a demonstration that the victim as been proximately

15    directly/indirectly harmed and is a victim of a violent crime

16    of sorts, which I think --

17        THE COURT:  Even though that's not --

18        MS. LIOU:  -- they have been able to constitute alien

19    smuggling, harboring, for example --

20        (Reporter interrupts.)

21        THE COURT:  You have to slow down.

22        MS. LIOU:  They have been able to constitute --

23        THE COURT:  Who's "they"?

24        MS. LIOU:  The court -- the Ninth Circuit has been

25    able to constitute crimes such as alien harboring and
```

1  smuggling, for example, as a violent crime, nonetheless,

2  warranting the victims in cases like that to be awarded

3  restitution for not only things related to wage and hour costs

4  but also things such as therapy.

5       So this particular case, *United vs. Sanga*, that Ms. Nguyen

6  cited, I believe, is a very similar case involving a domestic

7  worker who ultimately --

8            THE COURT:  But in this case we don't have an alien

9  smuggling charge in this, at this point.

10           MS. LIOU:  Correct, but it is, I believe, analogous, a

11  case that originally was also the underlying facts involving

12  involuntary servitude concerns and charges.

13           THE COURT:  But, now, see, you're tying it to the

14  original indictment and complaint.  And I'm saying I can't do

15  that because the government has dismissed those charging

16  documents.

17           MS. LIOU:  You're correct, Your Honor, and we

18  merely -- you asked earlier if there was particular cases on

19  hand, and this is something that we think is relevant in this

20  case.  And it is simply our concern that we believe that the

21  restitution amount in this plea agreement does not --

22  significantly undervalues the losses accorded to Ms. Doe, that

23  she is entitled to for restitution in this case, even as the

24  plea has gone down to visa fraud.

25           THE COURT:  Am I correct that the restitution amount

1   that you seek in your papers here in this proceeding are

2   overlapped and subsumed in the civil case?

3        Is there an element here that's not already covered by the

4   civil case?

5             MS. NGUYEN:  We haven't had a -- we haven't really

6   done that analysis.

7             THE COURT:  Well, I mean, it certainly looks that way

8   to me.

9        And I don't see why this is not better tried in a civil

10  arena.  You have a civil case.  The standard of proof is lower,

11  the burden of proof is lower.

12       I see tremendous problems in trying to say, well, you need

13  to consider the -- I should reject this plea because there is

14  truth to these broader allegations that are not admitted here

15  and not subject to this plea.  And for me to get into the

16  veracity of that when it appears to be in dispute is like

17  trying the case.

18            MS. NGUYEN:  Your Honor, and that's why I said that we

19  believe, based off the facts that are agreed to in the plea

20  agreement, that it already -- that these are proximately caused

21  by those harm -- by those facts that are --

22            THE COURT:  That I can assess.

23            MS. NGUYEN:  Yeah.  So, for example, they did agree to

24  pay restitution of $13,000, so they admit that Ms. Doe did

25  suffer losses.

1          **THE COURT:**  All right.  And, as I understand the

2     restitution amount here, that is -- I guess what they're

3     arguing is that that's an implicit admission of a proximate

4     cause relationship.

5          **MR. MARTIKAN:**  Well, let me address that because --

6     and the government -- and I'm not questioning the victim's

7     status as a victim.  But restitution amounts in plea

8     agreements, as negotiated in plea agreements under the MVRA,

9     the Mandatory Victims Rights Act, do not necessarily have to

10    involve victims.

11         There's a provision, 3663 capital A -- uhm, (A)(3), that

12    the Court shall order, if agreed to by the parties in a plea

13    agreement, restitution to persons other than the victim of the

14    offense.

15         So I don't think --

16         **THE COURT:**  So there's particular authority, then,

17    that gives deference to a plea agreement, that relieves the

18    Court of having to impose and to apply a proximate cause

19    relationship --

20         **MR. MARTIKAN:**  Or to impute --

21         **THE COURT:**  Pardon?

22         **MR. MARTIKAN:**  Well, to impute causation of damages,

23    basically.

24         And I'm not saying that the victim is not a victim.  The

25    government believes she's a victim.  I'm just saying that you

1 don't impute from the fact that there's a restitution amount

2 agreed to in a plea agreement that there was a proximate cause

3 of any particular harms.

4         **THE COURT:**  All right.  Well, I'm going to rule

5 substantively, I think, notwithstanding the late filing, it is

6 a -- I'm prepared to rule after considering the filings that

7 have been made by the victim in this case.  I do find and I

8 will accept the plea agreement under 11(c)(1)(C).

9      The only dispute that I'm hearing from the victim has to

10 do with the amount of restitution.  And I think everybody

11 agrees, based on the last statement I heard from Ms. Nguyen,

12 that restitution amounts should be measured based on the crime

13 as pled to and as defined.

14      And it is defined here not only by the statute but by the

15 factual allegations that have been admitted contained in

16 paragraph 2 of the plea agreements.

17      Those admissions have to do with obtaining the visa when

18 the defendants knew that she would be -- the victim would be

19 working for persons other than themselves, for another person.

20 It does not contain allegations and admissions with respect to

21 many of the assertions that are contained in the victim's

22 statement and filings with this Court.

23      And I find that the assertion of restitution that has been

24 made in those filings are not sufficiently causally related as

25 required by the statute; for instance, Section 3771(e), as well

1  as the case law that requires a causal relationship to the

2  crime of conviction, offense of conviction, not just as was

3  charged and then later superseded.

4       And in that regard, *Hughey vs. United States*, 495 U.S.

5  413, cited by -- in the defendants' memorandum, as well as

6  *United States vs. Reed*, a Ninth Circuit case also cited in

7  there.

8       And so I do find that there is not the kind of proximate

9  cause to the crime as charged and pled to in this case to

10 warrant overturning and rejecting the plea agreement.  And,

11 therefore, I'm going to overrule the objection and, as I had

12 noted, accept the plea agreement under 11(c)(1)(C).

13      And, therefore, the sentence I will impose -- what

14 paragraph is that contained in?

15           **MR. COHEN:**  What are you looking at, Your Honor?

16           **THE COURT:**  The plea agreement that contains the --

17           **MR. MARTIKAN:**  Paragraph 8.

18           **MS. SHIFMAN:**  Eight.

19           **MR. MARTIKAN:**  I don't know if the defendants want to

20 allocute or something.

21           **THE COURT:**  All right.

22           **MR. MARTIKAN:**  Jump ahead.

23      (Defendant Mr. Penzato consults with his attorney sotto

24 voce.)

25           **MR. COHEN:**  Your Honor, on Mr. Penzato's behalf, we're

1  prepared to proceed to sentencing.

2          THE COURT:  All right.

3      And Ms. Penzato?

4          MS. SHIFMAN:  We'll submit it, Your Honor.

5          THE COURT:  All right.  I take it there's no prior

6  criminal history --

7          MR. COHEN:  Correct, Your Honor, for either defendant.

8          THE COURT:  -- in this matter?

9      All right.  Well, I've looked at, first of all, the

10 guideline range, and find that the base offense level for the

11 offense as charged is a Level 8, pursuant to U.S. Sentencing

12 Guideline Section 2L2.2(a).

13     There's been acceptance of responsibility here sufficient

14 to warrant a two-level reduction under Section 3E1.1, leading

15 to an adjusted offense level of 6.

16     I take it there's a stipulation that the criminal history

17 category is a 1?

18         MR. COHEN:  Yes, Your Honor.

19         MR. MARTIKAN:  Correct, Your Honor.

20         THE COURT:  All right.  And that the guideline range

21 is zero to six months under the sentencing guidelines.  And,

22 therefore, the sentence that has been agreed to under paragraph

23 8 is within the guideline range.

24     And, therefore, it is the judgment and order of this Court

25 that both defendants are sentenced to a term of five years'

1  probation under the standard terms and conditions that have

2  been imposed by this Court; will pay a $25 mandatory

3  assessment, special assessment each; and, I guess, jointly and

4  severally will pay restitution to C.D.S. in the amount of

5  $13,000, payable in full within seven days of today's date.

6      And, as I mentioned, that restitution liability is joint

7  and several as to both defendants.

8          **MR. COHEN:**  Your Honor, we have that payment here, and

9  we will tender it to the Court today.

10          **THE COURT:**  All right.

11          **THE CLERK:**  Go to the Clerk's Office.  I will give you

12  the forms.

13          **MS. SHIFMAN:**  Thank you.

14          **THE COURT:**  There will be a special condition of

15  probation as set forth in the plea agreement.  And that special

16  condition is that the defendants each shall submit themselves,

17  their residence, office, vehicle and any property under his or

18  her control to a search.

19      Such a search shall be conducted by a U.S. Probation

20  officer or any federal, state or local law enforcement officer

21  at any time, with or without suspicion.

22      Failure to submit to such a search may be grounds for

23  revocation.

24      The defendants shall warn any residents that the premises

25  may be subject to searches.

1        I think those are all the terms.

2            **MR. MARTIKAN:**  It's not, Your Honor.  There is another

3    term agreed to by the parties from paragraph 11 of the plea

4    agreement, which is, starting at line 14, that the parties

5    agree --

6            **THE COURT:**  All right.

7            **MR. MARTIKAN:**  The defendants agree not to have any

8    contact with victims or witnesses in the case, either directly

9    or indirectly, before or after sentencing, including but not

10   limited to personal contact, telephone, mail, social media, or

11   electronic mail contact, or any other written form of

12   communication with the individual identified as C.D.S. in the

13   charging document, or any member of her immediate family,

14   including her husband and son, and including any harassing,

15   annoying or intimidating conduct by the defendants directed to

16   any victims or witnesses in the case.

17           **THE COURT:**  All right.  And that is included as an

18   additional term of probation, as has just been read by

19   Mr. Martikan.

20       That means no contact with the victim or any member of her

21   family during this period of probation, which is five years.

22       All right.  Is there any other term that I missed?

23           **MR. MARTIKAN:**  Well, I don't know if Your Honor has to

24   read in the general terms, but I assume that the defendants

25   can't leave the Northern District of California without

1   permission of the Court or Probation.

2          MS. SHIFMAN:  That actually gets -- once the judgment

3   and commitment order gets issued, that gets reviewed directly

4   with them by the Probation Department.

5          THE COURT:  All right.

6          MR. MARTIKAN:  Right, but I think it has to be read

7   in --

8          MR. COHEN:  The fact of the standard conditions.

9          MR. MARTIKAN:  Right.  Don't they usually have to get

10  read again at sentencing --

11         THE COURT:  Well, normally, I have a probation report

12  and a --

13         MR. COHEN:  I think what the Court would normally say,

14  under these circumstances, that the defendants are directed to

15  comply with the standard conditions of Probation which have

16  been adopted by this Court.

17         THE COURT:  I think I said that, but I'll say that

18  again.  The defendants are to comply with the standard

19  conditions of Probation that have been adopted by this Court.

20  They include travel restrictions, as indicated, as well as a

21  number of other restrictions.

22      I don't have a list in front of me.

23         MR. MARTIKAN:  That's the only one I really cared

24  about, Your Honor.

25         THE COURT:  All right.

1      **MR. MARTIKAN:**  I think the other ones -- I don't think

2   they possess any firearms.

3      **MR. COHEN:**  They don't.

4      **MR. MARTIKAN:**  And I don't think they need drug or

5   mental health treatment.  So I -- that was the only one I was

6   particularly --

7      **THE COURT:**  Well, those terms will be in writing when

8   you get the judgment and sentence in this matter.  Normally,

9   Probation prepares the judgment and sentence.  But we don't

10   have Probation here, so I guess Betty will do that.

11      **MR. COHEN:**  Your Honor, two brief matters.

12      First of all, just to be clear, obviously, the civil case

13   proceeds.  The individuals who are plaintiffs in -- the

14   plaintiff in the civil case, as well as other witnesses, will

15   be contacted on behalf of the Penzatos through counsel.  And I

16   don't interpret the Court's condition to preclude that sort of

17   contact.

18      The Court is speaking of direct contact by the defendants,

19   correct?

20      **THE COURT:**  That's correct.  Obviously, that contact

21   has to be for legitimate purposes, for the purposes of

22   defending and litigating that piece of litigation, and not for

23   any extraneous purpose.

24      And that contact will be limited by counsel's contact,

25   since these defendants are represented therein.  There should

1  not be any direct or personal contact.

2         **MR. COHEN:**  Correct, Your Honor.  Thank you very much.

3    And the second matter is simply that when this matter was

4  originally scheduled to be sentenced in early May, the Penzatos

5  made arrangements to visit family members in the Los Angeles

6  area over the Memorial Day weekend.

7    That would be permissible under the standard conditions of

8  probation, but because of the now very compressed time period,

9  we wanted to ask the Court's permission so that we could

10 represent to the assigned probation officer that the Court had

11 given that permission.

12        **THE COURT:**  The Court has no objection to that, unless

13 the probation officer for some reason finds a problem.  I'm

14 going to defer to the probation officer in that.  I have no

15 standing objection to that.

16        **MR. MARTIKAN:**  No objection from the government, Your

17 Honor.

18        **THE COURT:**  All right.  Well, that is the judgment and

19 sentence of this Court.

20    And I do appreciate the participation of the counsel

21 representing the victim in this case in exercising her rights.

22 And, unfortunately, this was an unusual procedure and,

23 hopefully, everybody understands that from now on that, should

24 this unusual situation arise again, there's got to be notice

25 given to all sides.  But I assume this is a one-off and we

1  won't see this again.

2       So, appreciate your participation.

3          **MR. COHEN:**  Thank you, Your Honor.

4       (Counsel thank the Court.)

5       (At 12:02 p.m. the proceedings were adjourned.)

6                              -   -   -   -

7

8

9

10                 <u>**CERTIFICATE OF REPORTER**</u>

11          I certify that the foregoing is a correct transcript

12  from the record of proceedings in the above-entitled matter.

13

14  DATE:   Thursday, May 30, 2013

15

16

17

18  _____

19       Katherine Powell Sullivan, CSR #5812, RPR, CRR
                    U.S. Court Reporter

20

21

22

23

24

25